IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37121-2-III |
| Respondent, | ) | (Consolidated with |
| | ) | No. 37424-6-III) |
| v. | ) | |
| | ) | |
| JEREMIAH JAMES GILBERT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — The detailed facts underlying Mr. Gilbert's convictions are outlined

in *State v. Gilbert*, 193 Wn.2d 169, 438 P.3d 133 (2019) (*Gilbert* I).

FACTS

In 1992, shortly before his sixteenth birthday, Jeremiah Gilbert and his friend ran

away from home in King County and headed toward Oregon. In Klickitat County, Mr.

Gilbert murdered two people execution-style and attempted to murder a third person

while attempting to steal a vehicle. Mr. Gilbert was convicted of six serious offenses,

including first degree murder, aggravated first degree murder, second degree assault, first

degree burglary, first degree theft, and first degree robbery. He was sentenced to life

without the possibility of parole for the aggravated first degree murder conviction

consecutive to a sentence of 280 months on the first degree murder and concurrent with the sentences for the other convictions.

Following the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), Washington eliminated mandatory life sentences without parole for juvenile offenders and enacted the *Miller*-fix statute, RCW 10.95.035. Under this statute, juveniles previously sentenced to life without parole are to be returned for resentencing in accordance with RCW 10.95.030.

In 2015, Mr. Gilbert was resentenced by a second judge under the *Miller*-fix statute. The sentencing court concluded that it could only amend the life sentence without parole and did not have the authority to restructure the entire sentence. Accordingly, the court adjusted the life without parole sentence to life with a 25-year minimum term. Mr. Gilbert appealed this sentence, and our State Supreme Court reversed and remanded for resentencing. The court held that its holding in *Houston-Sconiers*, 188 Wn.2d 1, 21, 391 P.3d 409 (2017), applied to a resentencing under the *Miller*-fix statute. *Gilbert* I, 193 Wn.2d at 175. Consequently, the sentencing judge must consider Mr. Gilbert's youth as a mitigating factor and had the authority to impose an exceptional sentence below any mandatory or standard range sentencing requirements. *Id*.

While Mr. Gilbert's second sentence was pending before the Supreme Court, the Indeterminate Sentence Review Board (ISRB) determined that Mr. Gilbert was eligible

2

for release on the aggravated murder sentence and that he had finished serving the concurrent sentences. In April 2018, Mr. Gilbert was released on parole on the aggravated murder charge and began serving his consecutive sentence for first degree murder.

Before his second resentencing, Mr. Gilbert again retained the expert services of Dr. Ronald Roesch, a psychologist who had reviewed Mr. Gilbert's case and prepared a report for Mr. Gilbert's first resentencing in 2015. Defense counsel's motion to authorize $5000 in public funds to retain Dr. Roesch was denied, but the trial court authorized $2500 in fees.

A second resentencing occurred in May 2019 before a third sentencing judge. The State presented testimony from eight survivors of the victims along with the surviving victim, Farrell Harris. The court also considered written impact statements from survivors and family members. These witnesses and survivors recounted how the murders had dramatically affected their lives and continued to cause trauma each time Mr. Gilbert was resentenced. Consistently, these witnesses asked the court to impose the longest sentence possible.

Defense counsel called four members of Mr. Gilbert's family as witnesses. They testified that they maintained good relations with Mr. Gilbert and could provide him with a place to live, a job, and family support if he were to be released. Mr. Gilbert testified himself, apologized for his crimes and asked for a concurrent sentence.

Defense counsel filed extensive documentation supporting an exceptional sentence, including letters of support, certificates of achievement while in custody, and Department of Corrections (DOC) records. The court also considered a previously written report for the ISRB by Dr. Debra Wentworth[1] and the ISRB's decision to release Mr. Gilbert on his sentence for aggravated first degree murder.

Defense counsel also presented the report and testimony of its expert psychologist, Dr. Roesch. Dr. Roesch generally testified about adolescent development and cognitive functioning, echoing the generalized findings made in *Miller* and subsequent cases. He testified that as a class, fifteen-year-olds lack maturity and have an underdeveloped sense of responsibility. While they generally understand the difference between right and wrong, they have an issue with impulse control and considering the long and short-term consequences of decisions.

More specifically, Dr. Roesch testified that his evaluation of the circumstances surrounding the original crimes suggest that the 15-year-old Jeremiah Gilbert met most of the *Kent*[2] factors for declining juvenile jurisdiction but lacked maturity and sophistication. Dr. Roesch characterized the murders as unplanned while acknowledging

---

[1] Dr. Wentworth is a psychologist employed by the Department of Corrections and had prepared and submitted a report for the ISRB to consider in deciding whether to parole Mr. Gilbert on his sentence for aggravated first degree murder. She did not update her report for this sentencing hearing nor did she testify.

[2] *Kent v. United States*, 383 U.S. 541, 566-67, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966).

a definite plan to commit crimes on the trip to Oregon. As to remorse, Mr. Gilbert initially denied involvement but quickly admitted his culpability and had not changed his story. Dr. Roesch acknowledged that Mr. Gilbert was primarily responsible for the crimes he committed, and Mr. Gilbert did not appear to be influenced by peer pressure in committing the crimes.

Dr. Roesch also testified about Mr. Gilbert's circumstances at the time of the crime. Mr. Gilbert's home life was generally positive, although the family moved frequently, and Mr. Gilbert's relationship with his parents began to deteriorate when he began abusing alcohol at a young age. On the Adverse Childhood Experiences scale, Mr. Gilbert scored a zero, indicating that he did not have exposure to emotional, physical, or sexual abuse or household dysfunction during childhood. Mr. Gilbert's use of alcohol as a teenager most likely impacted his brain development. But there was no evidence that he was under the influence of drugs or alcohol when he committed these crimes.

Finally, Dr. Roesch testified about Mr. Gilbert's activities while incarcerated. While Mr. Gilbert did well in juvenile detention, he struggled when transferred to adult corrections, accumulating at least 36 serious infractions over the first dozen years. The last two infractions were committed in 2006 when Mr. Gilbert was 30 and in 2017 when he was 40 years of age. Mr. Gilbert has participated in several programs while incarcerated and continues to maintain close contact with his family. Dr. Roesch

indicated that the correctional officers he had interviewed consistently stated that Mr. Gilbert was responsible, helpful, and contributed positively.

The sentencing court also considered evidence of psychological testing. Both Dr. Roesch and Dr. Wentworth conducted personality tests on Mr. Gilbert, and neither found evidence of mental health or personality disorders, or psychopathology. Dr. Wentworth did find some evidence of antisocial behavior and characteristics "that may continue to influence his future behavior choices." Clerk's Papers (CP) at 254.

Both psychologists administered risk management tests to assess the risk of future violence and recidivism. Dr. Roesch determined that Mr. Gilbert had a low risk to reoffend. Dr. Wentworth used a more recent and comprehensive version of the violence risk assessment guide (VRAG) and found that Mr. Gilbert's scores placed him "in the high risk to reoffend." CP at 254. However, when balanced against Mr. Gilbert's protective and risk-reducing factors, his overall risk of reoffending was considered moderate. Attorneys for both sides dedicated significant time addressing each of the factors the court was to consider in determining an appropriate sentence. Defense counsel argued that juvenile offenders as a class should receive significantly reduced sentences for their crimes, even when convicted as adults. The State asked the court to reimpose the original sentence of 280 months. Defense counsel argued for a concurrent sentence of 25 years.

Although the court did not create written findings, its oral decision made several specific findings addressing the *Miller* factors and other factors affecting sentencing as directed by the Court in *Gilbert* I. As to Mr. Gilbert's "immaturity and inability to appreciate risk," the court found that at the time of the crime, Mr. Gilbert was an unsophisticated 15-year-old, unable to fully appreciate the risks of running away. His inability to appreciate risk was balanced by his prior involvement in the criminal justice system just months before the murders.

Mr. Gilbert was the product of a good family, but his surrounding environment became dysfunctional due to alcohol use at a young age. Mr. Gilbert's family tried to get him treatment for his alcoholism.

Considering Mr. Gilbert's participation in the crime, the court found that Mr. Gilbert held an active leadership role in crimes committed callously. Mr. Gilbert took his time to execute two individuals, one of whom he shot point-blank in the head to "shut him up." RP at 183. Mr. Gilbert's youth did not affect any legal defenses or arguments. (*Id.*) Nor were the crimes influenced by family dynamics or peer pressure.

Next, the court addressed factors suggesting that the juvenile might be successfully rehabilitated. The court noted that Mr. Gilbert's program participation demonstrated potential for rehabilitation while incarcerated. He has, however, received two serious infractions that indicate a lack of impulse control as an adult. The court

suggested that Mr. Gilbert's good behavior may be influenced by a hope for resentencing.[3]

The court discussed Dr. Wentworth's 2017 psychological examination, noting that Mr. Gilbert exhibited antisocial personality characteristics that may influence future behavior choices. His score on the violence risk assessment, placing him at high risk to reoffend, was balanced by other risk-reducing factors for a finding of moderate risk to reoffend. Finally, the court considered the convictions at issue, finding that the murder convictions are at the apex of the culpability scale, and Mr. Gilbert was convicted of three other violent offenses from the same incident. The standard sentencing range called for a minimum 20-year sentence for Count 1, first degree murder, to run consecutive to the 25-year sentence for count 2, aggravated first degree murder and concurrent to the other charges, which had already been served.

In the end, the court expressly recognized that it had the authority to grant an exceptional sentence but found that the crimes were not the result of transient immaturity that would support an exceptional sentence. Instead, the court found that the mitigating factors of youth justified a reduction in Mr. Gilbert's sentence for murder in the first

---

[3] In the October 24, 2013 Department of Corrections Offender Management Network Information notes that were provided to the sentencing court, Amber Bates noted increased program participation and that Mr. Gilbert "is also looking forward to a court decision in Nov[ember] 2013 that may change his sentence structure. He is already planning for re-entry into the community an[d] working on not thinking about prison as 'home.'" CP at 404.

degree by 40 months to 240 months, the bottom of the standard range. The court

reimposed the already-served 25-year sentence for aggravated murder concurrent with the

sentences for other charges that had already been served. Finally, the court ran the 240-

month sentence for first degree murder consecutive to the sentence for aggravated first

degree murder.

## ANALYSIS

A.  DE FACTO LIFE SENTENCE

Mr. Gilbert raises several issues on appeal that are premised upon his assertion

that the sentence imposed in this case was a de facto life sentence. We address this

argument first because it is dispositive. To be clear, on remand, Mr. Gilbert was

sentenced to 240 months for first degree murder, to run consecutive to his already-served

25-year sentence for aggravated first degree murder and concurrent with the sentences for

his other serious offenses. The cumulative sentence is 45 years. Mr. Gilbert will be

eligible for release when he is 60 years old.

While a sentence of life without parole for juvenile offenders is not barred by the

federal constitution, our State Supreme Court has held that such a sentence is

categorically prohibited under our State Constitution. *Jones v. Mississippi*, 593 U.S. __,

141 S. Ct. 1307, 1311, 209 L. Ed. 2d 390 (2021) (imposing a sentence of life without

parole on a juvenile defendant does not require a finding of incorrigibility); *State v.

Bassett*, 192 Wn.2d 67, 91, 428 P.3d 343 (2018). Our Supreme Court has recently held

that a "46-year minimum sentence amounts to an unconstitutional de facto life sentence." *State v. Haag*, No. 97766-6, slip op. at 20 (Wash. Sept. 23, 2021), http://www.courts .wa.gov/opinions/pdf/977666.pdf. While the defendant in *Haag* was convicted of only one murder, the court's decision was not influenced by the quantity or quality of convictions for which the defendant was sentenced. Instead, in reaching this decision, the court focused on the impact the sentence would have on the defendant. *Id*. at 23-24.[4]

Mr. Gilbert's consecutive sentences amount to a 45-year sentence. Given the Supreme Court's focus in *Haag*, there is no meaningful difference between a 46-year sentence and a 45-year sentence. Under *Haag*, Mr. Gilbert received a de facto life sentence. Under *Bassett*, life sentences for juvenile offenders are categorically prohibited. In light of *Haag*, we vacate Mr. Gilbert's sentence and remand for resentencing.

Since we are remanding under *Haag*, we decline to address Mr. Gilbert's claim that the trial court abused its discretion. We note, however, that *Haag's* analysis on a sentencing court's focus will control on resentencing in this case. It will be necessary for

---

[4] In *Haag*, the court found that the 46-year sentence violated both the 8th Amendment and the state constitution because the sentencing court made a specific finding that Haag was "not irretrievably depraved." *Haag*, at 24. In this case, the sentencing court found that the crimes were not the result of transient immaturity, but did not make a finding that the defendant was permanently incorrigible. Nevertheless, under our state constitution, a sentence that amounts to life without parole for a juvenile offender is categorically prohibited.

the State and Mr. Gilbert to present evidence at resentencing and for the court to make

specific findings of fact and conclusions of law to support the sentence imposed.

B.   JUDICIAL BIAS

Mr. Gilbert asserts that the sentencing judge demonstrated actual bias because his

oral decision did not seem "off the cuff" and the court partially denied his motion for

expert witness fees.  The only relief he seeks is reassignment at resentence.

Pursuant to the appearance of fairness doctrine, a judicial proceeding is valid if a

reasonably prudent, disinterested observer would conclude that the parties received a fair,

impartial, and neutral hearing.  *State v. Solis-Diaz*, 187 Wn.2d 535, 540, 387 P.3d 703

(2017).  The party asserting a violation of the appearance of fairness must show a judge's

actual or potential bias.  *Id*.  The test for determining whether the judge's impartiality

might reasonably be questioned is an objective test that assumes a reasonable observer

knows and understands all the relevant facts.  *Id*.  The remedy of reassignment is

available only in limited circumstances; even when a trial judge has expressed a strong

opinion, reassignment is generally not available as a remedy if an appellate opinion offers

sufficient guidance to limit the trial court's discretion on remand.  *Id*.  In *Solis-Diaz*, the

judge expressed frustration and unhappiness with the Court of Appeals and suggested that

he was committed to the original sentence and would not modify it on remand.  *Id*. at

541.

Nothing like *Solis-Diaz* happened here.  This particular judge had not previously

sentenced Mr. Gilbert and made no remarks indicating he was committed to any

particular sentence.  Instead, the judge accepted and considered all of Mr. Gilbert's

evidence and closely followed the Supreme Court's mandate.  His comments on the

murders and their effect on the community reflect the seriousness of the crime and do not

demonstrate bias.  Accordingly, Mr. Gilbert has not met his burden of showing actual

bias.

C.    EXPERT WITNESS FEES

Mr. Gilbert asserts that the trial court's order, limiting public funds for payment of

an expert psychologist to $2500, was manifestly unreasonable.  Prior to resentencing, Mr.

Gilbert motioned the court for public funds to rehire a defense expert psychologist, Dr.

Ronald Roesch.  Dr. Roesch prepared a report for Mr. Gilbert's first resentencing in

2015, and his fees were $4500.  For the second resentencing, defense counsel filed

supporting documentation, requesting $5000 for 32 hours of services at $225 per hour,

plus travel expenses.  The court approved $2500 for Dr. Roesche to update his report.

Dr. Roesch submitted a 13-page addendum report and testified at sentencing.

After sentencing, Dr. Roesch moved to reduce the authorized funding to a flat fee

of $5000.  In a supporting declaration, counsel indicated that Dr. Roesch had spent 27

hours on the case.  At a rate of $225 per hour, his fee would normally be $6075, but he

would agree to $5000 and also agree to pay his own travel costs.  The declaration in

support of the motion for fees broke down Dr. Roesch's time as follows: testimony and

travel (8 hours), telephone calls with correctional officers and the attorney (5.75 hours),

new interviews of Mr. Gilbert and his family (5.75 hours), report preparation (4.75

hours), and record review (2.75 hours). The court denied the additional funding request

and authorized payment of $2500.

Mr. Gilbert moved to reconsider, citing local expert rates of $200 and $360 per

hour and concluding that the time expended was reasonable. The court denied

reconsideration.

Under CrR 3.1(f)(1), a defendant unable to afford necessary services may move

the court to authorize payment for such services. This rule applies even when a

defendant obtains private counsel. *State v. Punsalan*, 156 Wn.2d 875, 878, 133 P.3d 934

(2006).

> Reasonable compensation for the services shall be determined and payment
> directed to the organization or person who rendered them upon the filing of
> a claim for compensation supported by affidavit specifying the time
> expended and the services and expenses incurred on behalf of the
> defendant, and the compensation received in the same case or for the same
> services from any other source.

CrR 3.1(f)(3). The court's determination as to what services are necessary and what

amount is reasonable will not be reversed absent an abuse of discretion. *State v. French*,

157 Wn.2d 593, 607, 141 P.3d 54 (2006). A court abuses its discretion when its decision

is manifestly unreasonable or based on untenable grounds. *State v. Delbosque*, 195

Wn.2d 106, 116, 456 P.3d 806 (2020) (internal quotations omitted) (quoting *State v. Blair*, 191 Wn.2d 155, 159, 421 P.3d 937 (2018)).

While the sentencing court did not give a reason for denying Mr. Gilbert's motion for reconsideration, the record supports that the decision was not manifestly unreasonable. The primary difference between the services provided in 2015 and the services provided in 2019 was travel and testimony time. Dr. Roesch did not testify at the first resentencing, but billed five hours for travel and three hours for testimony for the second resentencing. At the second resentencing, Mr. Roesch largely read from his 2019 report, which mirrored his 2015 report except for the incorporation of legal argument, and the reports by ISRB and Dr. Wentworth. Most of the rehabilitation programming information from the most recent four years' material to the *Miller* analysis appeared in the referenced reports and did not seem to derive from the new reinterview of Mr. Gilbert his family, or the duplicate DOC interviews. Primarily the interviews and support letters vouched for his character and offered post release support in the same manner as four years previously. Moreover, defense counsel failed to indicate any attempts to eliminate or reduce costs in light of the court's preliminary decision. Instead, it seems that counsel went forward without regard to the court's decision.

We find that the sentencing court's limit of public funds to $2500 was not an abuse of discretion. We recognize that our decision to remand for resentencing may require additional investigation services.

No. 37121-2-III (Consol. with No. 37424-6-III)
*State v. Gilbert*

Vacate sentence and remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Siddoway, J.

15